IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THOMAS E. PEREZ,[1] Secretary of Labor, United States Department of Labor, <br><br> Plaintiff, <br><br> v. <br><br> SUPER MAID, LLC, an Illinois limited liability company, d/b/a SUPERMAID, and PAUL KRAWCZYK, an individual, <br><br> Defendant. | No. 11 C 07485 <br><br> Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

The Secretary of Labor (the "Secretary") filed this suit against Super Maid, LLC ("Supermaid"[2]) and its president and owner, Paul Krawczyk. The Secretary alleges that the defendants violated the Fair Labor Standards Act ("FLSA") minimum wage, overtime, and recordkeeping provisions. The Secretary seeks unpaid compensation, liquidated damages, and an injunction preventing the defendants from further violating the FLSA. The Court now considers the Secretary's motion for summary judgment.

### I. Background

#### A. Undisputed Material Facts

The following facts are taken exclusively from the Secretary's Local Rule 56.1(a)(3) statement (Dkt. 64, referred to herein as Pl.'s 56.1). The defendants did not file a response to the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), Thomas E. Perez, who became the Secretary of Labor on July 23, 2013, is substituted for Secretary Hilda L. Solis as defendant.

[2] Both "Super Maid" and "Supermaid" are used in the filings in this case. For internal consistency, "Supermaid" is used throughout this opinion.

1

Secretary's 56.1(a) statement, nor any statement of additional material facts pursuant to Local Rule 56.1(b)(3)(C). As a consequence of their failure to respond to the statement of material facts, the facts in the Secretary's statement are deemed admitted. *See* Local Rule 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing part."). The Court still construes those facts in the light most favorable to the defendants and draws all reasonable inferences in their favor. *See Keeton v. MorningStar, Inc.*, 667 F.3d 877, 844 (7th Cir. 2012).

Supermaid is an Illinois limited liability company that provides cleaning services to households and businesses in Chicago, the Chicago suburbs, and Northwest Indiana. Krawczyk, the sole owner and president of Supermaid, manages the company's day-to-day operations. He controls pay and employment practices, including hiring workers, assigning work, setting wages, and handling payroll and timesheets. Supermaid's annual dollar volume of sales exceeded $500,000 each year from 2009 to 2012.

Applicants for jobs with Supermaid are required to sign three forms, entitled: "Employee Application for Supermaid, LLC," "Employee Non-Compete Agreement for Supermaid, LLC," and "Employee Responsibilities & Agreement." The Non-Compete Agreement states:

> For good consideration and as an inducement for **Supermaid, LLC** the undersigned Employee hereby agrees not to directly or indirectly compete with the business of the Incorporation and its successors assigns during the period of employment and for a period of **3 years** following termination of employment and notwithstanding the clause or reason for termination. . . .
>
> The term "not compete' as used herein shall mean that the **Employee shall not accept employment or be employed (either legally or on a cash basis) by any current or former customer of the Incorporation.** . . .

Pl.'s 56.1 ¶ 13 (emphasis in original). Krawczyk testified that the Non-Compete Agreement means that maids may not work for another maid service and that he told maids that they were not supposed to work for another maid service. In training, maids are told that if they are caught with their own clients, Krawczyk would keep their last check or sue them. On at least one occasion, Krawczyk confronted a maid who, he suspected, was taking Supermaid's customers and threatened to take her to court. Supermaid's maids believe that they are not allowed to clean houses other than those assigned to them by Supermaid.

Supermaid's maids think of themselves as employees, not independent contractors. Supermaid does not typically engage maids on a temporary or short-term basis. Applicants applying to Supermaid often seek permanent or long-term work; this matches clients' preferences to have the same maids clean their premises on a regular basis. Supermaid frequently assigns the same maids to the same customers; it stated on its website that it "understands the importance of being comfortable with who you have in your home" and "will make every effort to provide consistency in your staff." Pl.'s 56.1 Ex. D. Applicants are not required to have a bond or carry their own insurance, and Supermaid's maids do not carry their own insurance. Supermaid has a bond and carries liability insurance for its maids' work at various worksites.

Newly hired maids are required to complete "no more [than three] days" of on-the-job training. Defs.' Interrog. 33, Pl.'s Ex. G. During training, new maids accompany established teams to learn how Supermaid performs the work; the established maids also verify the skill level of the new maids. New maids also complete one-and-a-half to three hours of office training during which Supermaid explains company regulations, including the Non-Compete Agreement. From 2005 through July 2013, Office Manager Andrea Munoz was usually in charge of

scheduling new maids for training and explaining the rules and regulations to them. After a new maid "qualifies her standards to [Supermaid's]," Supermaid begins assigning the maid to jobs. *Id.* at 8.

Maids' cleaning duties include vacuuming, dusting, cleaning kitchens and bathrooms, trash removal, washing floors, and making beds. Krawczyk considers this to be an "easy job" that does not require a special skillset. Krawczyk Dep. 169–70, Pl.'s Ex. C. Supermaid determines who will be on each cleaning team, sets daily work schedules, and specifies on-site cleaning procedures; it also provides cleaning supplies, tools, and the required vehicles for use in travel to jobsites. The vehicles, Supermaid-branded Honda Elements, are used by Supermaid as a means of cheap advertisement for the company. Supermaid pays for gasoline, maintenance, and insurance for the vehicles. Supermaid advertises that it uses "National Brand Cleaning Products"; it does not allow maids to use alternative products to those it provides to them without prior approval and a product test. Pl.'s 56.1 Ex. D. Supermaid requires maids to clean floors on their hands and knees; it prohibits the use of a mop even if it is a maid's preferred method. Supermaid also requires maids to wear a uniform consisting of a white polo shirt and a specific type of pants.

Supermaid sets the number and schedule for jobs that its maids are to complete. Routinely, it scheduled maids to work six days per week. Maids are expected to complete their assignments in a specified order and at a specified time. They are not allowed to change the order of their assignments without prior approval from Supermaid. Supermaid sometimes refuses requests to change the order of assignments or to work more or fewer jobs. Maids are not allowed to begin cleaning early if they arrive at a house before their scheduled time without

4

advance approval by Krawczyk; they also may not leave early if they complete cleaning the house before the scheduled time. At the end of each day, maids are sometimes required to call Supermaid, at which point they may be assigned additional jobs to complete that day. Supermaid's Officer Manager attests that if a maid refuses the additional jobs, Krawczyk becomes angry and threatens to take pay out of the maid's paycheck. Several maids attest that they generally begin work at 8:00 a.m., but may start as early as 6:00 a.m.; they finish work roughly between 5:00 and 7:00 p.m., with some variation. Maids generally clean a total of three to seven houses per day, taking between two and four hours per house.

Supermaid pays maids on a weekly basis. Maids usually go to the Supermaid office to pick up their paychecks and supplies. Supermaid charges its customers an average of $80 per house, although the fee can range between $60 and $150. After a remodeling project, Supermaid charges up to $400 or $500. The maids' pay is based on a set amount for each house cleaned instead of how many hours that they work. Supermaid designates a pay rate depending on the type of house and the nature of the cleaning required, paying more for certain larger houses. When maids begin working for Supermaid, the person who drives the company vehicle is paid $20 per house and the passenger is paid $15 per house. Some maids have been given raises at Supermaid's discretion; others have been denied raises. Performing faster or more efficiently cannot positively affect maids' pay because their schedules are set the day before they work, in many cases the jobs assigned take longer than allotted, and maids risk pay deductions if rushed work causes client complaints. Maids are not allowed to hire others to do their work or assist them. Supermaid does not pay more for hours worked in excess of forty per week, nor does it record or compensate for time spent traveling from the time that the maid who is driving the

company vehicle picks up the passenger to the first jobsite, between jobsites, or from the last jobsite to the time of passenger drop off. Maids testified that it generally took about one hour to travel between jobs, though it could take as little as thirty minutes or as much as two hours. Supermaid also does not provide maids with paid breaks or meal periods. Maids are required to eat meals in the vehicle between jobs or when they get home; they may not take lunch breaks.

Between 2000 and roughly the beginning of 2010, Supermaid maintained Microsoft Excel spreadsheets that Krawczyk used to calculate what to pay maids. The spreadsheets indicate the number of jobs maids worked and the amounts paid to them. Krawczyk also used comments in the spreadsheet to note pay deductions for a variety of reasons. Maids did not submit invoices to Supermaid to charge it for their work; instead, they used Supermaid-created timesheets to track their jobs each week.

Supermaid installs GPS tracking systems in each team's vehicle to enable real-time monitoring in the company's office. If maids are running late, are not at the correct location, or stop to eat lunch, Supermaid calls them to tell them to hurry up. Maids are punished with pay deductions if the GPS reveals that they used the vehicle on personal time. If a maid takes a day off, Supermaid sometimes will discipline that maid by assigning more or fewer jobs, dirtier jobs, or jobs that are further away. Supermaid also disciplines maids by taking them off the cleaning schedule. In an answer to one of the Secretary's interrogatories, Supermaid admitted that it stops assigning jobs to individuals who are the subject of customer complaints. It also withholds pay for failure to comply with uniform requirements, parking and traffic fines, vehicle damage, missing cleaning products, and damage to clients' personal belongings during cleaning.

From 2010 to 2011, Investigator Gilberto Herrera of the U.S. Department of Labor's Wage and Hour Division (the "Division") investigated Supermaid to assess its compliance with the FLSA. Krawczyk represented Supermaid during the investigation and maintained that Supermaid's maids were independent contractors, not employees. After Herrera interviewed twenty-four maids and Supermaid produced some pay records, time records, and tax forms, Supermaid was advised that the Wage and Hour Division found that Supermaid had wrongly classified employees as independent contractors. The Division also found that Supermaid withheld minimum wage and overtime pay from sixty employees. Notwithstanding these findings, Supermaid has continued to classify and compensate maids as independent contractors.

The Division retained Deloitte Financial Advisory Services LLP's Federal Discovery Practice ("Deloitte") to calculate back pay for Supermaid's workers. Deloitte received sixty-two payroll records, each for a unique employee name, and 4539 timesheets. It manually coded these records to obtain the necessary data to calculate back pay. Supermaid failed to produce payroll records for several maids and the timesheets that it produced frequently excluded full names, "time out" designations, and complete dates, requiring Deloitte to make logical assumptions to calculate back pay. Deloitte concluded that unpaid minimum-wage and overtime compensation totaling $92,252.63 was due for fifty-six employees.

### B. Procedural History

On October 21, 2011, the Secretary filed a complaint seeking to enjoin the defendants from violating the FLSA and to recover unpaid minimum wage and overtime compensation owed to employees along with an equal amount of liquidated damages. During discovery, the Court granted the Secretary's motion to compel Supermaid and Krawcyzk to produce records

necessary to assess compliance with FLSA and awarded attorney's fees to the Secretary, granted the Secretary's motion to deem admitted Requests for Admission to which the defendants failed to respond, and was forced to schedule a rule to show cause hearing as to why defendant Krawcyzk should not be held in contempt for his failures to provide required discovery and to abide by the Court's orders. On November 25, 2013, the Secretary filed this motion for summary judgment. Consistent with their conduct throughout the course of this litigation, neither Supermaid nor Krawcyzk filed a response.

## II. Discussion

The Secretary moves for summary judgment against the defendants for violations of the minimum wage, overtime, and recordkeeping provisions of the FLSA, 29 U.S.C. § 206, 207, and 211(c). "Summary judgment is appropriate if the evidence demonstrates that there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). A party "may move for summary judgment by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)) (internal quotation marks omitted). Although the defendants failed to respond to the Secretary's motion for summary judgment, "a nonmovant's failure to respond to a summary judgment motion, or failure to comply with Local Rule 56.1 does not . . . automatically result in judgment for the movant." *Keeton*, 667 F.3d at 884 (citing *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006)). The moving party "must still demonstrate that he is entitled to judgment as a matter of law." *Id.*

### A. Scope of the FLSA

As an initial matter, the Court must determine that this case falls within the scope of the FLSA by determining whether, under the statute, Supermaid is an "enterprise engaged in commerce," Krawczyk individually is an "employer," and Supermaid maids are "employees" rather than independent contractors. The interpretation of these terms under the FLSA must be "broad and comprehensive in order to accomplish the remedial purposes of the Act." *Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740, 747 (N.D. Ill. 2011) (quoting *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987)).

#### 1. Supermaid as an "Enterprise Engaged in Commerce"

In order to be subject to the FLSA's minimum wage and overtime compensation requirements, Supermaid must be an "enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a)(1). The FLSA defines "enterprise" as "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose . . . ." 29 U.S.C. § 203(r)(1). A enterprise is "engaged in commerce" if it (1) "has employees engaged in commerce or in the production of goods for commerce" or "has employees handling, selling, or otherwise working on goods or materials that has been moved in or produced for commerce by any person" and (2) realizes an "annual gross volume of sales made or business done" of at least $500,000. 29 U.S.C. § 203(s)(1)(A).

The defendants concede that Supermaid is an enterprise under the FLSA. Answer ¶ III, Pl.'s Ex. B. They also concede that Supermaid is engaged in commerce under this definition. Answer ¶ IV. In light of these concessions, Supermaid as an entity meets the prerequisites for liability for its FLSA violations. *See also Harris v. Skokie Maid & Cleaning Service*, 2013 WL

9

3506149, at *5 (N.D. Ill. 2013) (holding that an entity that employed maids to clean homes was an "enterprise engaged in commerce" where maids handled goods that traveled in interstate commerce and used cleaning products not manufactured in Illinois).

### 2. Krawczyk as "Employer"

The Secretary also seeks to hold Krawczyk, as the president and owner of Supermaid, individually liable as an "employer" for the alleged FLSA violations. The FLSA defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Courts assess the "economic reality" of the working relationship to determine whether an individual is an employer under the FLSA. *See Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 785 (N.D. Ill. 2011) (quoting *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961)); *Nehmelman v. Penn Nat. Gaming, Inc.*, 790 F. Supp. 2d 787, 795 (N.D. Ill. 2011). *See also Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987) (noting that "employer" is defined broadly in the FLSA to includes individuals with supervisory authority who are responsible for the alleged violation in whole or in part); *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983) ("[A] corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation jointly and severally liable under the FLSA for unpaid wages." (collecting cases)). The economic reality assessment encompasses several factors, including whether the individual: "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Nehmelman*, 790 F. Supp. 2d at 795 (quoting *Alvarez v. Downtown Food Enters., Inc.*, No. 10 C 4509, 2010 WL 5158122, at *2 (N.D. Ill. Dec. 13, 2010)).

Krawczyk's position as Supermaid's sole owner and president coupled with his extensive oversight of Supermaid's operations show that the economic reality of the working relationship here supports individual liability. He testified that he is responsible for managing the day-to-day operations of the business, including hiring, work schedules, discipline, and pay. Maids do not have the discretion or authority to hire others to assist in their work. Instead, Krawczyk requires prospective maids to apply directly to work for Supermaid through the company's hiring process that he manages. Maids must clear schedule variations with Krawczyk individually. He disciplines maids and personally enforces Supermaid's employment policies, such as by threatening to withhold pay from or sue maids who work for him who violate the Non-Compete Agreement. Finally, he oversees pay and maintains employment records, using spreadsheets to track jobs, make note of discipline-related pay deductions, and calculate pay due. His control over and personal involvement in hiring, supervision, pay, and recordkeeping shows that Krawczyk is an "employer" under § 203(d), and is individually liable for FLSA violations.

### 3. Maids as "Employees"

For the defendants to be liable under the FLSA, there must also be an employer-employee relationship. The Secretary argues that the maids who work for Supermaid are employees and not independent contractors. An "employee" is defined as "any individual employed by an employer"; "to employ" is defined as "to suffer or permit to work." 29 U.S.C. § 203. Courts assess the "economic realities" of the situation to distinguish employees from independent contractors. *See Int'l Detective*, 819 F. Supp. 2d at 749 (citing *Lauritzen*, 835 F.2d at 1534); *Skokie Maid*, 2013 WL 3506149, at *6. The test analyzes whether individuals are "actually dependent upon the business to which they render service." *Int'l Detective*, 819 F.

Supp. 2d at 749 (internal quotation marks and citation omitted). The relevant factors are: (1) the nature and degree of the alleged employer's control of the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his or her managerial skill; (3) the alleged employee's own investment in equipment or materials required for the work or his or her employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an "integral part" of the alleged employer's business. *Skokie Maid*, 2013 WL 3506149, at *6–7 (quoting *Lauritzen*, 835 F.2d at 1534–35). No single factor is dispositive. *Id.* at *6.

***Control.*** Evidence displaying an "employer's dominance over the 'manner and method' of how work is performed" suggests control by an employer. *Skokie Maid*, 2013 WL 3506149, at *7 (quoting *Harper v. Wilson,* 302 F. Supp. 2d 873, 878 (N.D. Ill. 2004)). In *Int'l Detective,* for example, an employer controlled job performance by specifying operating procedures, dictating reporting protocol, and monitoring employees' compliance. 819 F. Supp. 2d at 750. In *Skokie Maid*, which involved circumstances similar to this case, the owner of a maid cleaning service "exercised significant control" by dictating workers' cleaning schedules, setting mandatory training standards, specifying cleaning policies as a means of quality control, and deducting pay for noncompliance. 2013 WL 3506149, at *7.

Here, the record demonstrates that the defendants have substantial control over the manner and method of the maids' work. They conduct training and set training standards. They dictate what cleaning products are permissible and require maids to use particular cleaning methods, even specifying that floors must be cleaned on maids' hands and knees without the aid

12

of a mop. Maids have to work in Supermaid uniforms. The defendants set work schedules and require maids to complete tasks in a specified order at a specified time. The defendants track the Supermaid-branded vehicles that they are required to drive via real-time GPS to ensure compliance with company policies—if the GPS shows deviation from the assigned schedule, Supermaid calls the worker and tells them to increase their pace. Maids who diverge from their schedules, are the subject of client complaints, misplace cleaning products, take unauthorized breaks, or use company vehicles for non-work activities are disciplined by reprimand, deduction of pay, or changed work assignments. The undisputed facts in the record more than adequately display that the defendants exert significant control over the manner and method by which maids perform their work for Supermaid, weighing in favor of the maids qualifying as employees.

***Opportunity for Profit and Loss.*** "An independent contractor risks loss of an investment and has the opportunity to increase profits through managerial discretion." *E.E.O.C. v. Century Broadcasting Corp*. No. 89 C 5842, 1990 WL 43286, at *4 (N.D. Ill. Mar. 23, 1990) (citing *Lauritzen,* 835 F.2d at 1536). Strict prearranged pay scales and situations that do not afford workers "managerial discretion" to adjust their hours or work more efficiently eliminate the opportunity for those workers to realize increased profits by adjusting their own performance. *See Int'l Detective,* 819 F. Supp. 2d at 748; *Skokie Maid,* 2013 WL 3506149 at *8. In *Skokie Maid*, compensating workers on a per-house basis and strict enforcement of permitted work hours weighed in favor of employee status. With Supermaid, workers are similarly not allowed to vary their start and end times, even if they are able to complete their work more efficiently than scheduled; their ability to perform more effectively does not increase their ability to increase their personal pay or profits. The defendants have made no showing, and the Court sees

13

no basis in the record to find, that the maids in this case have any autonomy to increase their earning rate through managerial discretion, again weighing in favor of employee classification.

*Relative Investment.* Large personal investments are more representative of an independent contractor than an employee. Such investments include "large expenditures, such as risk capital, or capital investments, and not negligible items or labor itself." *Lauritzen,* 835 F.2d at 1537 (quoting *Donovan v. Gillmor*, 535 F. Supp. 154, 161 (N.D. Ohio 1982)). In *Skokie Maid*, this factor weighed toward employee status where maids did not finance their own cleaning supplies nor secure their own insurance. In that case, there was "no evidence that the maids were required to bring anything to the worksite except themselves" and they were not allowed to hire assistants. *Skokie Maid,* 2013 WL 3506149, at *8. This case presents nearly a mirror image of those circumstances: Supermaid provides insurance, vehicles, transportation expenses, and cleaning supplies. Maids may not contract out work or hire others to assist them. Again, the record offers no basis to find that these maids make the type of investments typical of independent contractors.

*Special Skill.* Although certain highly specialized job skills support independent contractor classification, "[s]kills are not the monopoly of independent contractors," as all jobs require some modicum of skill. *Lauritzen*, 825 F.2d at 1537. Maintenance work, such as "cleaning, sweeping floors, mowing grass, unclogging toilets, changing light fixtures, and cleaning gutters," does not necessarily involve such specialized skills as would support independent contractor status. *Bulaj v. Wilmette Real Estate & Mgmt. Co.*, No. 09 C 6263, 2010 WL 4237851, at *7 (N.D. Ill. Oct. 21, 2010). In *Skokie Maid*, the court determined that cleaning services, although difficult and demanding, were even less complex than those maintenance

services. 2013 WL 3506149, at *8 (quoting *Bulaj,* 2010 WL 4237851, at *7). Here, the workers' skill requirements mirror those of *Skokie Maid*. The tasks here include vacuuming, dusting, cleaning kitchens and floors, making beds, and taking out trash. In his deposition, Krawczyk essentially conceded this factor by testifying that it is an "easy job." Krawczyk Dep. 169 –70, Pl.'s Ex. C. The fact that the workers in this case undergo training does not change the calculus. *See Harper v. Wilson*, 302 F. Supp. 2d 873, 879 (N.D. Ill. 2004) (noting that training only developed the baseline job skills and was not sufficiently "special" to make worker an independent contractor). As Judge Holderman has noted, "[t]he maids' work may be difficult and demanding, but it does not require special skill." *Skokie Maid*, 2013 WL 3506149, at *8.

***Permanence of the Working Relationship.*** "The more permanent the relationship, the more likely the worker is to be an employee." *Schultz v. Capital Int'l Security, Inc.,* 466 F.3d 298, 309 (4th Cir. 2006). In *Skokie Maid*, the court noted that non-compete agreements that prevented maids from working for competing providers for one year following termination suggested that they were not independent contractors. 2013 WL 3506149, at *9. The court firmly rejected the notion that Skokie Maid could designate maids as independent contractors—who would normally be free to utilize their skills in an open market—while simultaneously restricting that very ability. In this case, the non-compete agreements prohibit the workers for even a longer period: three years following termination. Several maids stated that they did not own their own companies and that they are economically dependent on Supermaid. Furthermore, the record shows that longevity of employment plays an important role in Supermaid's business model: applicants to Supermaid seek long-term employment and the typical client prefers the same

15

maids to clean for them for an extended time frame. This evidence further suggests an employer-employee relationship.

***Integral Part of the Business.*** Individuals are more likely to be employees if they perform "the primary work of the alleged employer." *Harper*, 302 F. Supp. 2d at 879 (quoting *Donovan v. DialAmerica Mktg.*, 757 F.2d 1376, 1385 (3d Cir. 1985)); *see also Lauritzen,* 835 F.2d at 1537–38 (migrant workers who harvested pickles for a business that sold pickles were integral to the operation). Here, the primary business of Supermaid is providing cleaning services. Maids who work for Supermaid perform that cleaning. *See Skokie Maid,* 2013 WL 3506149, at *9. It is difficult to imagine how much more directly these workers could perform the primary work of Supermaid. This final factor also weighs in favor toward employee status.

Based on this record, the Court agrees with the Secretary. Despite Supermaid's classification of its maids as independent contractors, the Court finds that they are employees under the FLSA.

### B. Damages for Minimum Wage and Overtime Violations

Because the FLSA applies, the defendants were required to comply with its minimum wage, overtime, and recordkeeping requirements. 29 U.S.C. §§ 206, 207, and 211(c). The FLSA minimum wage provision requires employers to pay each employee a minimum wage of at least $7.25 per hour. 29 U.S.C. § 206(a). The Secretary contends that during the relevant period in this case, the defendants did not pay the minimum wage for time spent traveling between jobsites, in violation of the "continuous 'workday' rule" that defines a workday as "the period between the commencement and completion on the same workday of an employee's principal activity or activities," including "all time within that period whether or not the employee engages in work

throughout all of that period." 29 C.F.R. § 790.6(b); s*ee also IBP, Inc. v. Alvarez, 546* U.S. 21, 25–26, 29, 37 (2005). Travel time from home to work and back are normally considered preliminary and postliminary activities and not "integral and indispensable" to "principle" work activities that require compensation, but "any activity that is 'integral and indispensable' to a 'principal activity'" is itself a principle activity and is therefore compensable under the FLSA. *Alvarez*, 546 U.S. at 37. This includes time spent traveling from jobsite to jobsite. 29 C.F.R § 785.38.

The defendants, relying on their use of the independent contractor classification, never seriously disputed that they did not pay for travel between jobsites. They instead paid a predetermined amount for each cleaning job regardless of the number of hours worked or the time spent traveling to that job. Commuting time between jobsites ranged from thirty minutes to two hours, with travel required between jobsites in Chicago, its suburbs, and Northwest Indiana. The defendants prohibited driving company vehicles to places other than maids' homes and jobsites. They monitored their workers with GPS and enforced compliance with their instructions to travel directly from jobsite to jobsite during the workday. The Secretary, with Deloitte's assistance, used the employees' timesheets, which note the times that maids start and end at each house cleaned during a workday, to determine the number of hours worked between the first and last jobsite each day.[3] The total number of hours worked each week was then divided by the pay reflected in the defendants' records to determine if each hour worked was paid at the required

---

[3] Affidavits of several maids suggest that this could range from roughly 6:00 a.m. to 7:00 p.m. for a day in which anywhere from three to seven houses were cleaned by a Supermaid cleaning team.

17

rate of $7.25 an hour, calculating $1187.60 due to eight employees in unpaid minimum wage.[4] As the Secretary notes, *see* Mem. 10 n.4, this amount reflects unpaid minimum wage due to just a few employees of the many that may have been affected by the defendants' failure to pay the required minimum wage, which in part stemmed from their policy of not compensating for travel time between job sites. The defendants' failure to provide more complete time and pay records prevented the Department from accurately assessing the total deficiency.

The FLSA overtime provision requires employers to pay employees "no less than one and one-half times" their regular pay rate for time worked in excess of forty hours per workweek. 29 U.S.C. § 207(a)(1). The defendants again do not seriously dispute their lack of compliance. They pay a flat fee per site regardless of the number of hours worked, do not pay for travel time between sites, and sometimes require six-day workweeks. The Secretary, again with Deloitte's assistance, calculated $91,065.02 in unpaid overtime due to fifty-five employees in unpaid overtime.

As already noted, the Secretary's ability to calculate the minimum wage and overtime shortfalls was substantially hampered by Supermaid's failure to maintain and produce adequate records. The FLSA requires covered employers to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him." 29 U.S.C. § 211(c). An employer's failure to do so shifts the burden of proof concerning back wage liability to the employer. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946); *Wirtz v. Turner*, 330 F.2d 11, 13–14 (7th Cir. 1964). When this occurs, the party alleging wage and hour violations fulfills the initial burden by

---

[4] The method used also captured the minimum wage due where the total hours worked exceeded the flat pay rate, not just where travel time was uncompensated.

showing that work was performed that was not properly compensated and producing evidence to show the nature and extent of that work as a matter of reasonable inference. If the employer does not then present precise evidence or rebut the reasonableness of the inference, the court may then award damages, "even though the result be only approximate." *Anderson*, 328 U.S. at 688; *Int'l Detective*, 819 F. Supp. 2d at 753 (adopting Secretary's calculations where reliable evidence supported the amount and where the employer did not submit contrary facts); *Skokie Maid*, 2013 WL 3506149, at *10. Here, the defendants submitted incomplete records, frustrating the possibility of an exact back pay assessment. Where gaps existed in the records provided, the Secretary had to reconstruct an average hourly rate and total time worked to calculate what was due in minimum wage and overtime. The defendants have not rebutted those calculations, therefore the Court adopts their calculation of $92,252.63 in total back pay due.

The Secretary also seeks liquidated damages in an equal to the amount of back wages due to employees. Absent a showing of good faith and reasonable belief by the employer that it was in compliance with the FLSA, there exists a presumption that double damages be awarded. 29 U.S.C. §§ 216(b), 260; *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1223 (7th Cir. 1995); *Skokie Maid*, 2013 WL 3506149, at *11. Here, the defendants have not provided any basis to believe that they acted in good faith or reasonable belief that they complied with the FLSA. In fact, they continued to classify Supermaid's workers as independent contractors even after the Department of Labor investigated their practices and informed them that their workers were employees. As a consequence, the Court concludes that an award of liquidated damages in the amount of $92,252.63 is appropriate, for a total damages award of $184,505.26.

### C. Injunction

District courts have authority to restrain violations of FLSA pay provisions. 29 U.S.C. § 217. An injunction is appropriate after FLSA violations are established if "there are insufficient assurances that defendants will comply with the FLSA in the future." *Int'l Detective*, 819 F. Supp. 2d at 754. In view of the defendants' recalcitrance even after the Department of Labor investigated the defendants and advised them that their maids were employees, their failure to maintain and produce reliable records, and their generally inadequate and reluctant compliance with their obligations in litigating this case, the Court has no basis to believe that the defendants will comply with their future obligations under FLSA without an injunction. They offer no mitigating factors or assurances, therefore the Court grants the Secretary's request for an injunction.

\*  \*  \*

For these reasons, the Court grants the Secretary's motion for summary judgment [62]. The Court will enter judgment against the defendants in the amount of $184,505.26, and enjoin the defendants from violating § 215 of the FLSA in the future.

Date: July 14, 2014

John J. Tharp, Jr.
United States District Judge